My name is Derek Anderson and I'm here to represent the Intelligery Phillips Fund Police Advocacy in court today. The judgment entered in favor of the Advocacy by the District Court must be reversed because the only logical conclusion from the findings of fact made at the District Court level would require the judgment be entered with respect to the intel of all three of her claims. Are you agreeing with the findings of fact? Are you disputing any of those findings of fact? You will not hear me dispute one finding of fact. I just wanted to make sure. I just wanted to make sure. Okay. There's a completely different standard and I do anticipate that the FLE is going to claim that we're disputing the findings of fact. We are not. We are disputing the conclusions of law which clearly are reviewed under a de novo standard. Now I will start with the failure to accommodate claim to the extent that it offers the clearest example that the result from findings of fact is that the appellant is entitled to judgment. That also feeds into the disability discrimination claim. If the court looks at the portions of the findings of fact that relate to the appellant's request for accommodation and specifically those findings of fact are found. Findings of fact number 64, 65, and 66, it's clear that the appellant requested and was granted an accommodation that allowed her to work four days per week instead of five. A reduction in her caseload and that she wouldn't receive any home-based referrals. And also a statement that her current caseload happened to be 29 cases which was the second most among the clinicians at her employment site. And subsequently was 28 cases which was actually the highest amount of cases among her co-workers. Now, with respect to the law regarding a request for accommodation, the law is very clear that the duty to accommodate rests with the employer, not the employee. And that duty is a continuing one that is not exhausted by the effort of simply granting accommodation. But it requires a continuing interactive process initiated by the employer to ensure that the reasonable accommodation is being implemented and met. In this case, what the district court found and what it based its conclusion of law upon was that the appellant had not continued to tell her boss, Ms. Hayes, that I have the highest caseload. I'm having trouble completing my work. However, the problem with that is, first of all, the request for accommodation itself, which is signed by Ms. Hayes, merely indicates that the appellant was requesting a reduction in her caseload. In addition, that was September 3rd, 2009. Five days later, the ADA interactive questionnaire that was completed by my client's physician again states that they request a reduction in her caseload and that her schedule be reduced from working five days instead of four. However, in spite of that, the employer in this case would have known that she had the highest possible caseload among her coworkers. And therefore, it was incumbent upon them to see what they could do to reduce that caseload to ensure that the accommodation was implemented and that she received the benefit of the accommodation that they claimed to grant her. You know, when you talk about accommodation, I think you mentioned it's kind of an interactive process between the employer and employee. And it seems to me that the trial judge decided that the ball was in your client's court in terms of kind of activating these accommodations. And I thought that was part of this findings effect. It is. And that finding of fact, which I'm not going to dispute, is irrelevant because the trial judge also correctly concluded that with respect to the odds, it relates to the failure to accommodate. And this is set forth in paragraphs 111, 112, and 113 of the findings of fact. It says the court's inquiry looks to whether the employers took reasonable steps to accommodate limitations in ways they would not impose on undue hardship. The ADA places a duty to accommodate on employers in order to remove barriers that could impede the ability of qualified individuals with disabilities to perform their jobs. Moreover, this is a continuing duty that is not exhausted by one effort. So counsel, the difficulty I'm having is that this matter has gone to trial. The judge heard all of the evidence and made a ruling. That's a very difficult proceeding to overturn once the judge has heard all of the evidence and made the determination of what exactly in the judge's ruling violated the law. In your view, what was inconsistent with the law in the judge's ruling after considering he heard all the evidence and this was a weak trial? Well, you're absolutely right, Your Honor. With respect to giving a great deal of confidence to the trial judge's determination, you've respected issues regarding credibility, findings of fact, things of that nature. But the trial judge also, within his findings of fact, correctly concluded that to determine the appropriate reasonable accommodation, it may be necessary for the covered entity, that's the employer, to initiate an informal interactive process with the individual with a disability in need of accommodation. But the judge did not find that the entity failed to do that. The judge made a determination that it was the plaintiff's duty, the appellant's duty, to bring these things up to her supervisor and because of that, that she didn't do what she needed to do. It's the plaintiff's duty to make the employer aware of the need for an accommodation. You're absolutely right, Your Honor, and the employee did that, the appellant did that, by submitting a request for accommodation that specifically says, I need a reduction in my caseload. That was thereafter followed, eight days later, by an ADA interactive questionnaire filled out by the employee's, the appellant's, physician in which it says, she needs to have her caseload reduced. She needs to have the days that she works reduced from five days to four days. And after that occurred, the employer was on notice, and they had a duty to continue to follow up to ensure the reasonable accommodation was handled. Now, what case say is that it is the employer's duty to follow up once it's done? Do you see what I mean? I just referenced it a moment ago on the specific case site or the specific statute. It's 29 CFR, section 1630. CFR is not a statute. It's a regulation, Your Honor, and a regulation that determines the duties of the parties relative to one another with respect to the duty to accommodate. The argument made to the district court, and what did the district court rule on that point? The district court noted that in its findings, the fact that that was the applicable regulation that applied with respect to was the argument made before the district court that the employer failed to comply with the regulation. I believe it was, Your Honor. I was the attorney that made those arguments, and I'm certain. Okay. Where in the record can we find a specific argument made that the employer failed to comply with the regulation by neglecting its duty to follow up on the accommodation? Well, Your Honor, you're finding a fact first where it is in the record that that argument was specifically made. Off the top of my head, Your Honor, I couldn't give you an exact citation to the record. However, if the court would allow me after oral argument to provide some sort of supplemental briefing. All right, we're hearing oral argument, and you made this argument before I saw. I was assuming that you would be able to point in the record where that specification was raised and decided by the court, because if it wasn't decided by the court in the context of the trial, it doesn't really come into play here, I hope. Well, Your Honor, if you look at finding of fact number 80, the distributive judge notes, further defendant Haines documented plaintiff's attempts to close cases. In other words, the employer was aware of what was going on, and he upheld its difficulty in closing cases. The judge goes on and says, overall, the supervision notes show that plaintiff did not make an adequate effort to reduce her caseload on her own. That leads into the conclusion of law that the judge made that by a preponderance of evidence, the plaintiff did not show that the employer failed to provide a reasonable accommodation. However, what the plaintiff did after she requested accommodation, after the employer was on notice by the ADA interactive questionnaire, and after the supervisor noted that she was having difficulty closing cases, it was the duty of the employer to ensure that that was done. And in this case, it shows that the appellant did what she needed to do, but besides providing the accommodation in and of itself, the employer thereafter did nothing, and as a result, they failed in their duty to accommodate plaintiff. Now, in spite, with respect to the disability discrimination claim, that also leads to the natural conclusion that appellant is entitled to judgment in her favor. The employer documented absences, emphasizing negative things about the employee and the appellant with respect to her absences immediately upon becoming her supervisor. The supervisor subjected the appellant to immediate disciplinary action after she became her supervisor, and thereafter, when the appellant complained about it, had an attorney write multiple letters, they threatened to fire her and then subsequently demoted her. What the record shows in totality is that this supervisor had it out to get this plaintiff from the very, very beginning, from the time she began supervising. The ultimate question is whether or not she was terminated because she wasn't doing the work properly, despite accommodation. That's partly correct, Your Honor. The standard with respect to a disability discrimination claim is a motivating factor standard. In other words, the ADA outlaws adverse actions motivated even in part by a disability or a request for accommodation. There's an example of multiple cases, but to be clear, there's the question, there was a disability here. And then there's also evidence with respect to the not being able to do the work. And the motivating factor, when we can't hear the witnesses and judge what was really going on, it's very difficult for us to say, no, the judge picked the wrong reason. And I understand that. That's why I started out with the reasonable accommodation claim because I think that one is very clear, and I understand the court's position and what it's saying. From my standpoint, whether I'm arguing to the court of appeal or I'm asking someone how to convene, you want to lead with your best foot first. That's why I started with the request for accommodation. And with respect to the disability discrimination claim, I understand what you're saying. However, if you look at the totality of the evidence here, where this supervisor was immediately antagonistic towards this employee, she immediately begins writing her up and then when challenged, devotes her and subsequently goes back to finding issues of fault and things like that. And then when she ultimately terminates her, the important thing is she notes in that termination that one of the significant reasons is absenteeism. That absenteeism was specifically caused by my client's chronic lung conditions, her pneumonia, and was causing her to miss a significant amount of work. So it wasn't just your client's pneumonia. She wasn't keeping appointments with clients that she had and she wasn't doing some other things like that. And then ultimately the district court found that there were some legitimate non-discriminatory reasons for terminating her. And that's one of his conclusions based on his findings. In fact, like I said, there were some. It wasn't just the absences that he focused on. It was her inability or her not doing the work and having other people cover for her when she didn't keep these appointments. That's correct, Your Honor, but what the record reflects is there were two instances in which she did not properly obtain cover with respect to appointments, and she missed a second of those incidents. She, because of a coughing related to her pneumonia, wasn't able to talk. And they found fault with her for doing that, although the record shows she made an effort to notify her employer and her coworkers that she was going to be missing that appointment. But the point is, in the termination report itself, and I've set forth in the excerpt of the record, it's not going to intrigue you, 6-3, page 161, it says that the employee evaluation, her attendance is unsatisfactory. Obviously that entails that a motivating factor, the reason for, one of the reasons for terminating her was the fact that she was missing work because of her disability. And as a result, it entails that she has established that her disability discrimination claim is valid because the termination was motivated, in part, by the fact that she was missing work as a result of her disability. And I realize I'm about to, I'm sorry. We'll give you a minute for a rebuttal, but you've exceeded your time. Thank you. Thank you. Good morning, Congress. My name is Rob, and as you know, I represent the Appellate Victor Community Support Services. In light of Counsel's argument, I'm going to go slightly out of the order that I had it. So what I want to do first is address the failure to accommodate, because it seems to be kind of a central point in Counsel's argument. But before I do that, what I want to just emphasize is the meticulous findings of fact by this district court. There were 105 clearly stated findings of fact that reference the evidence. And most importantly, I would argue that the judge indicates when there is credibility dispute, he determines to be more credible. And in every instance, with one exception, he determined that the supervisor of his homes, Deborah Higgs, was more credible. But one instance where he said that, in this credibility contest, Ms. Higgs didn't win had to do with her mistake in trial testimony about whether at the time of termination she was cognizant or conscious or recalling the fact that in 2009, Ms. Phillips had health difficulties. And clearly, it was a mistaken piece of testimony. But the judge said it had no bearing on her overall credibility over the course of several hours of trial testimony. But this is well-conceived in what they're saying. The record is obviously clear that Ms. Higgs was aware that Deborah Higgs had significant health difficulties in Ms. Phillips' experience in 2009. But the point is that this trial-judged testimony found Ms. Higgs to be credible in every instance of her matter. This is a very obviously fact in terms of case. Counsel made sweeping, sort of conclusory arguments with rare, exceptional, rare references to evidence. What I will do, and I hope this is important, is just reference some of the facts that were used in particular in the accommodation arguments that were made. The accommodation is on excerpts of the record 205. And it's in two parts. It's September 1st. It's signed by Ms. Phillips. And then there's a response to that on September 3rd, which bears the signatures of Ms. Phillips and Ms. Higgs. And I turned it down. I believe it was the HR manager. Well, it's critically important. And Ms. Phillips' accommodation is exactly what she said. She didn't ask for a reduction in her case load, as counsel argued. Literally, it says, I further request an accommodation in the case load. She goes on to say that she requested to not be given any home-based referrals. I'm also working on an adjusted schedule. The adjusted schedule will be from 40 to 32 hours. She goes on to state, I currently have 29 clients. Five of which are home-based. And eight of which opened last week. Nothing there states, I need a reduction of 29. If we look at the acknowledgment and acceptance of this accommodation on September 3rd, in the handwriting, there's nothing there stating that she needs a reduction in her case load. Judge Nunley was extremely brief in the findings of Act 73, year 80, regarding this very issue of accommodation. And what is significant, one reason this finding is a fact, is that Ms. Hanks met with, typically on a weekly basis, Ms. Phillips. She did that throughout the time that she was her supervisor in the 12 months that she supervised Ms. Hanks. These supervisory notes are detailed. They reflect, effectively, the interactive process once the accommodation was requested. But even proceeding with that, they reflect an effort on Ms. Hanks' part to do everything she could to work with Ms. Phillips to make her succeed. But regarding the findings of Act 1, Trial Court Number 78 states that on October 6, 2009, Court Mary wants to continue to expand groups. This may lead to an increase in the number of groups. So that contradicts this notion that she's asking for and getting no cooperation from a lawyer regarding a reduction in case load. She did testify that verbally she has asked Ms. Hanks for an extension of time and a reduction in her case load. Judge Nunley, in finding the fact that he rejected it, he stated that on this issue of credibility, he found that not to be credible. And in court, what he determined was when these supervisory notes were prepared by Ms. Hanks, they are almost by exception signed by Ms. Phillips. So in this period, September, October, November 2009, there is nothing in these supervisory notes that suggests any communication or desire on the part of Ms. Phillips to get help with either extending her time to further her case or to have a reduction in the case load. So there was an interactive process. Counsel in this period says she was left no longer. Ms. Hanks went out of her way to try to accommodate her and to allow her to succeed.  failure to accommodate. On... There isn't any specific finding on the issue of hostility, but there are some critically important findings. In fact, which I'll just highlight before I now swivel back into a bit of a chronological retrospective, what's critically important is, well, let's go back to November 2008. Ms. Hanks became Ms. Phillips' supervisor in October 2008. She wanted to become familiar with Ms. Phillips' background. She had worked with Ms. Phillips since she was a child. She prepared a lengthy recitation of what she thought were seven significant points for her to know as Ms. Phillips' supervisor. There were some references to her health there. The court specifically found in binding effect 40 that that review that she prepared did not indicate a pretextual intent to terminate Ms. Phillips. I would argue just the opposite. A good supervisor, which I contend the record confirms that Ms. Phillips was, should gather all detail about the person that they're supervising so that if there are any health issues, she can be knowledgeable. She is discharging her duties as a good supervisor of Ms. Phillips by understanding what her health history has been. The court did not find any malevolent or improper intent, just the opposite. Binding effect 40 says no pretextual intent to terminate. Then what we have as relates to the discrimination argument, in October, in November, and even December of 2008, we have at least three persons who were supervising Ms. Phillips, Rachel, Marcy, and Maria, who have significant complaints about how they are being supervised by Ms. Phillips. Ms. Phillips did not invent the clips. These were significant complaints that came to her, including complaints that she had been little to them. She did not hear them. One person did not feel safe being supervised. And when someone resigned and said, I'm going to close the access questionnaire, if you will, recommend that those things be terminated. And to the extent that there's no argument or suggestion that this was all newly contrived evidence, the record before Judge Napoli had decided to bind these back, is that a lot of the complaints said that this was, there were many people, many staff who had similar complaints and that it was long-standing. So he did, in his particular state document, just briefly on retaliation, there is an argument, as it holds, regarding two different attorneys, whether it's the, on January 7th, 2009, there was a meeting between Edwin Sings and Ms. Phillips. The court concluded that, with respect to testimony, that termination was discussed. In that instance, he said that the testimony of Ms. Phillips was more credible. She said termination was discussed as an option. Ms. Sings said she didn't recall. It's not a direct contradiction. But the judge said, yes, it's reasonable to conclude that termination may have been discussed. So termination was already on the table as at least one of the options. Shortly after that, there's this attorney letter, the date of January 8th. So the question is, is there any next, is there any causal link between any of that course of action? And in that letter, I would argue that there's no evidence that Judge Napoli concluded just that. What we have next on January 12th is another meeting where his severance and release package, if you will, was presented by Ms. Sings to Ms. Phillips. The court never concluded that that was an adverse action. So there was no adverse action that was in any way connected to the receipt of that first attorney letter. Offering someone a severance package is something that they can consider or reject, but it's actually not a compensation combo that you want to get with a straight termination. And then most significantly, there's another attorney letter that's dated around January 12th. What we have next following that is January 26th, 2009, a meeting in which the demotion occurs from a supervisor to simply a clinician. What the response of Ms. Phillips is, is to state on February 3rd, and this is all before the court, is that she will do her very best to fulfill her duties as a clinician. Nothing there that says what an outrage that she's being retaliated against, either because she contacted an attorney or because she is coming back from some health difficulties. Nothing there that suggests that there was any concern on Ms. Phillips' part that this demotion was an act of retaliation. I suggest that the court agree that there's substantial evidence based upon those complaints of the supervisees that she was not competent as a supervisor at that point. The mission of my client, which is a fairly large Northern California nonprofit, is to deliver mental health services to its clients. It has to have supervisors who are competently doing their work and then clinicians who are doing their work. If they aren't, the mission of my client and how people feel, there simply is no evidence of any retaliatory act whatsoever. And when we fast forward to the end of this chronology, we have ample evidence of non-discriminatory, non-retaliatory reasons as to why their relationship failed in the last two months. There was an August 19 incident in which Ms. Phillips left a client without coverage, did not cancel the client. It happened again on September 15th, and it appears to be happening again on October 29th or October 30th. So three significant failures. And, again, these are recently contrived events. In the January 26, 2009 demotion letter, it's referencing that very problem, not getting coverage, not contacting your supervisor. If you cannot make a meeting or a commitment with your clients, there's reference that you've demoted.  And then the final fact was that she then says, along with her mom, or about the end of October or early November, that her marriage, family, or any license has expired, which means she can't deliver the services to my clients. And ultimately, as it turns out, the license indeed expired. That wasn't known at the time, obviously, but the court stated in its findings that it wasn't whether she had or didn't have a license. It's a professional judgment, which was absolutely inadequate. So the record is complete with ample justification for termination, which has nothing to do with any protective activity or any adverse consequences. All right, thank you, Counselor. Thank you very much. I'd like to take one more call. Go ahead. Thank you, Your Honor. Whether there were ultimately legitimate non-retaliatory reasons for the discharge, there is still a duty to accommodate. If we look at excerpts of Record 12-5, accommodation and caseload, that means a reduction in caseload. Likewise, if you look at excerpts of Record 22, Ms. Hanks testified, that in order for a clinician to have a lower caseload, they have to transfer her closed cases off of their own caseload, and that's their responsibility. I documented numerous times supervision notes that plaintiffs failed to do her closings on time, and we talked several times about reducing her caseload, and that was up to her. It wasn't up to the employer. It was up to her employer to implement that accommodation. Finally, with respect to, she also testified, excerpts of Record 47, that would have made a difference that she was unable to close those files due to her medical condition. It would have if she had said that to me. That about sums it up. This employer was not interested in granting an accommodation, and ultimately the plaintiff was discharged, arguably for reasons that were discriminatory or retaliatory, but certainly there was no accommodation.
judges: Schroeder, Rawlinson, Drain